# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-00952-SCT

*TUNICA COUNTY, MISSISSIPPI*

*v.*

*CHRISTINA BELL GRAY, MILTON BELL,*
*CHARLES C. BELL AND GARMILLIA ANN BELL,*
*INDIVIDUALLY AND AS THE WRONGFUL*
*DEATH HEIRS OF CLARENCE LEON BELL,*
*DECEASED, AND THE ESTATE OF CLARENCE*
*LEON BELL, BY AND THROUGH ITS*
*ADMINISTRATRIX, AND RENEE DOWD*


| | |
|---|---|
| DATE OF JUDGMENT: | 05/01/2008 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DANIEL J. GRIFFITH |
| ATTORNEY FOR APPELLEES: | EDWARD P. CONNELL, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 07/23/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     In this case we are called upon to determine whether Mississippi Code Section 41-39-5 imposes an actionable duty on county boards of supervisors with regard to disposition of unclaimed bodies. The trial court found that the statute creates an actionable duty, and that the Tunica County Board of Supervisors violated that duty by authorizing the cremation of

an unclaimed body before the expiration of the statutory waiting period. The trial court awarded damages to the family of the deceased. Finding error, we reverse and render.

**FACTS**

¶2.     On April 12, 2001, Clarence Leon Bell was arrested by Tunica County Sheriff's Department deputies for disturbing the peace at Gold Strike Casino in Tunica. Bell was transported to the Tunica County jail where he was ultimately placed as the sole occupant in a padded cell. Several hours later, Bell was found dead in the cell, with a portion of his orange jumpsuit wrapped around his neck. Another portion of the jumpsuit rested in Bell's hand, suggesting suicide by strangulation.

¶3.     Tunica County Interim Coroner Jesse Powell was called to the scene. After EMTs were not able to revive Bell, the cell was locked, and the Mississippi Highway Patrol was called to investigate the death. That day, Bell's body was sent to Pearl for an autopsy, where Dr. Steven Hayne concluded that the death was caused by suicide due to ligature hanging.

¶4.     On the date of death, Powell began efforts to locate the family of the deceased. He derived Bell's social security number and date of birth from the jail's booking card, which also listed Bell's address as 667 North Ridge Road, Castle Rock, Colorado. No phone number was listed on the booking card. Powell contacted the Douglas County (Colorado) Sheriff's Department and, aided by the local victim assistance coordinator, spoke with a woman at the address, Ms. Dillman. Dillman made no mention of Bell's family and stated that, although Bell had once lived at the address, she had neither seen nor heard from him for more than ten years.

¶5. Also on the date of death, Powell checked both the FBI's National Crime Information Center database and the Automated Fingerprint Identification System fingerprint database, neither of which produced any leads. Powell contacted Gold Strike Casino, but was able to obtain only an old address and no details regarding next of kin or other contact information.

¶6. Powell next spoke with a Tunica County deputy, who had had prior experience with Bell. The deputy stated that, in an earlier conversation, Bell had mentioned having family around Holly Springs, but Bell did not know whether they still lived there. Powell then contacted the coroners of the surrounding counties to determine if they might be aware of any family of the deceased. The coroner in Holly Springs told Powell that "a lot of Bells live over here," and that he would attempt to locate any family members still in the area.

¶7. Bell's body was returned from the autopsy in Pearl on Friday, April 13, the day after death. Because Tunica County has no morgue, the body was held at a local funeral home.[1]

¶8. By letter dated Monday, April 16, 2001, Powell formally notified the Tunica County Board of Supervisors (hereinafter "the Board") that he had "come into possession of the body of Clarence Leon Bell" and that, albeit without success, he had "tried diligently to contact the family." Powell's letter also stated that the "body has not been claimed for a period of more than forty-eight hours of its acquisition by me." Powell testified that he informed the Board that he had information that there might be family of the deceased in Marshall County, and that, although efforts were being made to locate them, no family yet had been found.

---

[1]Tunica County could have opted to have the body returned to Jackson for storage in the morgue there, which would have cost the county $125 per day, plus transportation costs.

¶9.     By letter dated Friday, April 20, 2001, the Board authorized Powell to cremate the body, noting that reasonable efforts had been made to notify the decedent's family members and other interested parties, and the body remained unclaimed. The letter further stated, "It has been five days since the notice we received from [Powell]." Upon receipt of the letter, Powell issued a Medical Examiner Cremation Certificate to Larry Hickerson, funeral director of Memorial Funeral Home. The cremation occurred on the same day.

¶10.    The day after the cremation, Saturday, April 21, 2001, the coroner in Holly Springs called Powell and stated that "the family will be calling you in just a few minutes." However, Powell was not contacted by any of the deceased's family until May 4, 2001, twenty-two days after Bell's death.

¶11.    On May 4, 2001, Christina Bell Gray was notified for the first time that her brother, Clarence Leon Bell, had passed away.[2] Gray immediately called her brother, Milton Bell, and the two, along with Gray's boyfriend Roy Tubbs, drove to Tunica and met with Powell that day.

## PROCEDURAL HISTORY

¶12.    Gray, Milton Bell, Charles Bell, and Garmilla Ann Bell (hereinafter "Plaintiffs"), the siblings of the decedent, filed the instant action against Tunica County on June 17, 2004,[3]

---

[2]Gray was notified via telephone by her cousin, Betty Sue Scott.

[3]The Plaintiffs' 42 U.S.C. § 1983 claims were dismissed by the federal district court for the Northern District of Mississippi, whose judgment was affirmed by the Fifth Circuit on June 3, 2004. *Gray v. Tunica County, Miss.*, 100 Fed. Appx. 281 (5th Cir. 2004).

4

asserting that the county was negligent in handling the remains of Clarence Leon Bell.[4] The

Plaintiffs claimed that they had suffered damages "for inconveniences associated with

claiming the remains, denial of the opportunity to view the body, and denial of the

opportunity to choose the manner of disposing of the remains and for destruction by

cremation of the remains."

¶13.   Following a bench trial before the Circuit Court of Tunica County, the court entered

judgment in favor of the Plaintiffs and awarded compensatory damages in the amount of

$5,000 for each plaintiff, for a total judgment of $20,000.  The court found that the Board had

violated the mandatory provisions of Mississippi Code Section 41-39-5, which prescribes a

waiting period before cremation of unclaimed dead bodies.  Miss. Code Ann. § 41-39-5 (Rev.

2005).  The court further found that, as a result of the Board's failure to comply with

statutory requirements, the Plaintiffs had suffered injuries.

**ANALYSIS**

¶14.   As the basis for establishing liability on the part of the county, the Plaintiffs allege a

violation of Mississippi Code Section 41-39-5, a statute which provides a procedure for the

disposition of unclaimed dead bodies.  Miss. Code Ann. § 41-39-5 (Rev. 2005).  Tunica

County argues that the statute was created for the purpose of governing public health and

does not impose an actionable duty on county boards of supervisors.  Tunica County further

---

[4]Jerry Ellington originally was a defendant in the action, both individually and in his official capacity as sheriff of Tunica County.  By order of the court dated November 14, 2005, Ellington was dismissed.

5

asserts that the Plaintiffs' claims are barred by judicial, administrative, or discretionary immunity. Finally, Tunica County argues that the Plaintiffs cannot recover damages under this set of facts and cannot show causation.

¶15. Enacted by the Mississippi Legislature in 1964, Mississippi Code Section 41-39-5 provides:

> Any . . . coroner, or other person acquiring possession of a dead human body or portion thereof which is not claimed for burial or cremation within forty-eight hours of its acquisition shall give written notice thereof to the board of supervisors, or a member thereof, of the county in which the dead body or portion thereof is located, furnishing such identification of the decedent as may be available, and the board of supervisors shall make reasonable efforts to notify members of the decedent's family or other known interested persons, and, if the dead body or portion thereof shall not be claimed for burial or cremation by any interested person within five days of the aforementioned written notice, the board of supervisors shall, as soon as it may think appropriate, authorize and direct the burial or cremation and burial of the residue of such dead body or portion thereof. . . .

Miss. Code Ann. § 41-39-5 (Rev. 2005).

¶16. Without determining whether or not the county violated this statute, we note that a mere violation of a statute or regulation will not support a claim where no private cause of action exists. "[T]he general rule for the existence of a private right of action under a statute is that the party claiming the right of action must establish a legislative intent, express or implied, to impose liability for violations of that statute." ***Doe v. State ex rel. Miss. Dep't of Corrections***, 859 So. 2d 350, 355 (Miss. 2003). This Court has declined to find a "private right of action for violations of various statutes and regulations" in the absence of legislative

6

intent. *Id.* *See also* *Moore ex rel. Moore v. Mem'l Hosp. of Gulfport*, 825 So. 2d 658 (Miss. 1998); *Allyn v. Wortman*, 725 So. 2d 94 (Miss. 1998).

¶17. In *Doe*, this Court considered whether the Uniform Act for Out-of-State Parolee Supervision created a private cause of action for a woman who was raped by a parolee. Miss. Code Ann. § 46-7-71 (Rev. 2004). In reaching the conclusion that no private cause of action existed, this Court adopted the analysis of a Wisconsin district court:

> To determine whether a statute creates a private right of action in favor of a particular plaintiff, a court must analyze the statute itself and any relevant legislative history. The focal point is the legislative body's intent in enacting the statute. Unless the legislative intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.
>
> In this case, *nothing points in favor of implying a private right of action* for Hodgson. The Uniform Act [for Out-of-State Parolee Supervision] itself contains no statement of purpose or mention of the rights of the general public or potential victims of parolees or probationers who might relocate under the Act's provisions. At the same time, the Plaintiff has failed to point to any record of legislative history which shows that the lawmakers intended to benefit persons such as Hodgson or his daughter.

*Doe*, 859 So. 2d at 355 (quoting *Hodgson v. Miss. Dep't of Corrections*, 963 F. Supp. 776, 791 (E.D. Wis. 1997)).

¶18. In determining whether Mississippi Code Section 41-39-5 imposes an actionable duty on the Board of Supervisors, we first look to the language of the statute and any relevant legislative history. In order to ascertain the legislative intent, this Court "may look not only to the language used but also to [the statute's] historical background, its subject matter, and the purposes and objects to be accomplished." *Davis v. AG*, 935 So. 2d 856, 868 (Miss.

7

2006) (quoting ***Bailey v. Al-Mefty***, 807 So. 2d 1203, 1206 (Miss. 2001)). This Court considers "the purpose and policy which the legislature had in view of enacting the law . . . [and] will then give effect to the intent of the legislature." ***State ex rel. Hood v. Madison County ex rel. Madison County Bd. of Supervisors***, 873 So. 2d 85, 88 (Miss. 2004) (citing ***Aikerson v. State***, 274 So. 2d 124, 127 (Miss. 1973)).

¶19.   This statute was enacted May 4, 1964, as Section 3 of House Bill No. 139, and has not been amended since its enactment. Miss. Laws, ch. 436 § 3 (1964). House Bill No. 139 was intended by the Legislature "to provide for the disposition of tissue of the human body and unclaimed dead bodies; and for related purposes." ***Id.*** Indeed, Section 1 of House Bill No. 139 governs the procedure by which a physician must dispose of human body tissue that he has removed or otherwise acquired. ***Id.*** Section 2 of the bill states that the State Board of Health may provide rules for the disposition of any dead fetus acquired by a midwife or person acting as a midwife. ***Id.*** Originally codified as Sections 7068-01, 7068-02, and 7068-03 of the Mississippi Code of 1942, these statutes are still found together in today's Mississippi Code as Sections 41-39-1, 41-39-3, and 41-39-5.

¶20.   Noticeably, these statutes enacted by House Bill No. 139 now are codified under Title 41, which governs "Public Health." Chapter 39 of this title, governing "Disposition of Human Bodies or Parts," also contains statutes which provide for bodies of deceased hospital patients to be turned over to educational institutions, contracts for donation of parts of human bodies, tags on bodies of persons with infectious or communicable diseases, and regulations governing organ and tissue donors and donations. *See* Miss. Code Ann. §§ 41-39-7, 41-39-9,

8

41-39-13, and 41-39-15 (Rev. 2005). Further, the responsibility of boards of supervisors to bury unidentified or unclaimed bodies dates back to the Mississippi Code of 1906, which required that "the board [of supervisors] shall decently bury all strangers dying in the county." Miss. Code § 3568 (1906).

¶21. The Plaintiffs argue that Mississippi Code Section 41-39-5 was intended to create a private right of action in order to provide an opportunity for family members to claim the body of a loved one. However, "[u]nless the legislative intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Doe*, 859 So. 2d at 355 (quoting *Hodgson*, 963 F. Supp. at 791). The Plaintiffs point to no legislative intent, express or implied, that would support a finding of an actionable duty. Based on our review of the statute and the relevant legislative history, we cannot conclude that the Legislature intended to confer a private cause of action upon persons such as these Plaintiffs. In the absence of a finding of either express or implied intent to confer such a cause of action, we will not impose liability.

## CONCLUSION

¶22. This Court finds that Mississippi Code Section 41-39-5 does not create a private cause of action. Finding this issue to be dispositive, we do not address the remaining assignments of error presented by Tunica County. Based on the foregoing reasoning, we reverse and render the judgment of the circuit court.

¶23. **REVERSED AND RENDERED.**

9

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, AND PIERCE, JJ., CONCUR. GRAVES, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.**

**KITCHENS, JUSTICE, DISSENTING:**

¶24. As a determination upon a question of first impression, one cannot rightly describe today's judgment as a misapplication of on-point precedent, and I do not. Nevertheless, because the Court today misinterprets the manner in which we evaluate implied rights of action, I am compelled to dissent.

¶25. Section 41-39-5 of the Mississippi Code governs boards of supervisors' disposals of human corpses, or portions thereof. Since its first appearance in the Mississippi Code in 1942, this Court has never cited this statute, which reads, in pertinent part:

> Any . . . coroner . . . acquiring possession of a dead human body or portion thereof which is not claimed for burial or cremation within forty-eight hours of its acquisition shall give written notice thereof to the board of supervisors, or a member thereof, of the county in which the dead body . . . is located, furnishing such information of the decedent as may be available. The board of supervisors shall make reasonable efforts to notify members of the decedent's family or other known interested persons, and, if the dead body . . . shall not be claimed for burial or cremation by any interested person within five days of the aforementioned written notice, the board of supervisors shall, as soon as it may think appropriate, authorize and direct the burial or cremation and burial of the residue of such dead body . . . .

Miss. Code Ann. § 41-39-5 (Rev. 2005).

¶26. Although we have never had occasion to refer to this provision, the Mississippi Attorney General's Office has cited the statute six times in opinions issued to public officials. "While an attorney general's opinion is not binding on this Court, it is persuasive . . . ."

10

*DuPree v. Carroll*, 967 So. 2d 27, 31 (Miss. 2007). None of these opinions is entirely on point, in that none addresses whether Section 41-39-5 implies a right of action. However, several of them do address the inflexibility of the duty placed upon supervisors. One opinion describes Section 41-39-5 as "giv[ing] the board of supervisors the right and *responsibility* to bury unclaimed bodies . . . ." *Chamberlin*, 2003-0214 Op. Att'y Gen. (May 9, 2003) (emphasis added).

¶27. The most recent opinion rejected the notion that a family member can waive the five-day waiting period, despite concerns for cost of storage. "Our office is mindful of the expense to the county which compliance with this statute often requires. . . . However, absent an appropriate amendment to Section 41-39-5, we find no authority to waive the statutory five day waiting period." *McWilliams*, 2008-0254 Op. Att'y Gen. (May 30, 2008).

¶28. More relevant to the case at hand is a 1996 opinion finding that the supervisors' duty may actually extend beyond five days, if the survivors are unprepared to take custody of the deceased. "[I]f the county coroner has no available means of preserving a dead body until family members can make arrangements for a burial or cremation, the county board of supervisors has the duty to make arrangements for the preservation of such a body until family members may make such arrangements." *Hemphill*, 96-0586 Op. Att'y Gen. (Aug. 30, 1996).

¶29. These interpretations, along with the statute's repeated use of nondiscretionary terms such as "[t]he board of supervisors *shall* make reasonable efforts to notify members of the decedent's family" and that cremation may take place only when "the body . . . *shall not* be

11

claimed" leave little room for argument against the conclusion that a mandatory duty is imposed.

¶30.    This conclusion alone, however, does not resolve fully the question before us. "The general rule for the existence of a private right of action under a statute is that the party claiming such right must establish a legislative intent, express or implied, to impose liability for violations of that statute." *Doe v. State ex. rel. Miss. Dep't of Corrs.*, 859 So. 2d 350, 355 (Miss. 2003). The violation of a legally-imposed duty does not necessarily amount to a cause of action. *Id.* (citing *Moore ex. rel. Moore v. Mem'l Hosp. of Gulfport*, 825 So. 2d 658, 665-66 (Miss. 2002)). For example, in *Doe*, this Court favorably cited *Hodgson v. Mississippi Department of Corrections*, 963 F. Supp. 776 (E.D. Wis. 1997), in which a Wisconsin federal court found no private right of action against the State for violation of a Mississippi statute that governed the transfer of Mississippi parolees, even when the statute's violation led to the victim's rape:

> The [statute] itself contains no statement of purpose or mention of the rights of the general public or potential victims of parolees or probationers who might relocate under the Act's provisions. At the same time, the Plaintiff has failed to point to any record of legislative history which shows that the lawmakers intended to benefit persons such as [the plaintiff].

*Doe*, 859 So. 2d at 356 (citing *Hodgson*, 963 F. Supp. at 791). In 2007, the Mississippi Court of Appeals astutely described the rule of *Doe* as one that looks to the nature of the relationship between plaintiff and defendant. "In *Doe*, the State owed no duty to protect the specific victim. The relationship between the State and the victim arose solely out of the

12

assault by an attacker with whom the State had a relationship." ***Miss. Dep't of Human Servs. v. S.W.***, 974 So. 2d 253, 263 (Miss. Ct. App. 2007).

¶31.    Mississippi's line of case law on this subject is limited, but other states have explored the area more thoroughly and have settled upon the same rule. Notably, the Supreme Court of South Carolina recently held, similar to ***Doe*** (in a case of the same name), that "the general rule is that a statute which does not purport to establish a civil liability, but merely makes provision to secure the safety or welfare of the public as an entity is not subject to a construction establishing a civil liability." ***Doe v. Marion***, 373 S.C. 390, 396, 645 S.E.2d 245 (2007) (quoting ***Dorman v. Aiken Commc'ns, Inc.***, 303 S.C. 63, 67, 398 S.E.2d 687, 689 (1990)). In other words, "[w]hen a statute does not specifically create a private right of action, one can be implied only if the legislation was enacted for the special benefit of a private party." ***Doe v. Marion***, 373 S.C. at 397 (citing ***Citizens of Lee County v. Lee County***, 308 S.C. 23, 416 S.E.2d 641 (1992)). This view comports with the two Mississippi cases relied upon without dissent by the ***Doe*** Court, in which we found no private rights of action for violations of the State Board of Pharmacy's internal regulations and a statute that prohibits fraud in connection with securities sales. ***Doe***, 859 So. 2d at 355 (citing ***Moore ex. rel. Moore v. Mem'l Hosp. of Gulfport***, 825 So. 2d 658 (Miss. 2002), and ***Allyn v. Wortman***, 725 So. 2d 94, 102 (Miss. 1998)).

¶32.    Mississippi Code Section 41-39-5 is not silent respecting a relationship between the State and private parties. The statute's requirement that supervisors wait at least five days before disposing of a body does not merely seek "to secure the safety or welfare of the public

as an entity," ***Doe v. Marion***, 373 S.C. at 396, but instead clearly "was enacted for the special benefit of a private party." ***Id.*** at 397. Indeed, if the Legislature had enacted Section 41-39-5 with no other concern but the safety of the public in general, then presumably it would have allowed, and perhaps even commanded, supervisors to dispose of bodies as quickly as possible. Instead, the Legislature vested survivors with a five-day period of time in which they are guaranteed by state law that the keepers of their deceased loved ones' remains will make reasonably diligent efforts to locate and contact the decedents' survivors. Unlike in ***S.W.***, in which the Mississippi Court of Appeals held no private right of action existed because "[t]he relationship between the State and the victim arose solely out of the assault by an attacker," ***S.W.***, 974 So. 2d at 263, Section 41-39-5 creates a relationship between county and survivors that arises immediately upon a county's reception of a human corpse. This relationship occurs because of the "mention of the rights of . . . potential victims" that the ***Doe*** Court found absent in the parolee-relocation statute. ***Doe***, 859 So. 2d at 356. Indeed, the determination that this relationship and the implied cause of action stemming therefrom do not exist, coupled with the fact that this statute affixes no criminal penalty for violations thereof, effectively disembowels the statute and leaves counties no meaningful incentive to comply with the law's requirements.

¶33.    Comporting with neither sound policy judgment nor our deeper attention to implied causes of action, today's decision is one from which I respectfully dissent.

    **CHANDLER, J., JOINS THIS OPINION.**

14