# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00250-COA

**WILLIE B. TAYLOR, AS ADMINISTRATRIX OF THE ESTATE OF LEKENRAY TAYLOR, DECEASED**                                                  **APPELLANT**

**v.**

**DELTA REGIONAL MEDICAL CENTER**                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/10/2013 |
| TRIAL JUDGE: | HON. RICHARD A. SMITH |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | HELEN E. MORRIS |
| | JIMMIE L. COLLINS |
| ATTORNEYS FOR APPELLEE: | L. CARL HAGWOOD |
| | MARY FRANCES STALLINGS-ENGLAND |
| | JACOB O. MALATESTA |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| TRIAL COURT DISPOSITION: | JUDGMENT IN FAVOR OF DEFENDANT/APPELLEE AFTER BENCH TRIAL |
| DISPOSITION: | AFFIRMED - 02/16/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., JAMES AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     In July 2003, LeKenray Taylor was shot in the chest with a high-powered weapon during a drive-by shooting in Rosedale, Mississippi. He was transported to Delta Regional Medical Center (DRMC) but passed away several hours later. Willie Taylor, LeKenray's mother, subsequently filed suit against DRMC, alleging negligence. In 2013, the case finally proceeded to trial. Because DRMC is a community hospital, the case was tried before a

circuit judge without a jury pursuant to the Mississippi Tort Claims Act (MTCA).[1]  At trial, Taylor advanced two basic theories of negligence: (1) that the general/trauma surgeon on call in DRMC's emergency room should have performed thoracic surgery on her son even though the surgeon concluded that he lacked the necessary training and privileges to do so; and (2) that, under the regulations governing the Mississippi Trauma Care System in July 2003, DRMC was required to have a thoracic surgeon on call twenty-four hours a day, seven days a week.  After hearing the evidence, the circuit judge found, inter alia, that DRMC and its physicians met the standard of care and complied with the trauma care system regulations; that Taylor did not timely or properly plead a violation of those regulations; and that DRMC was immune from liability with respect to any claim that it should have attempted to hire more thoracic surgeons.  Accordingly, the circuit judge entered judgment in favor or DRMC and dismissed Taylor's complaint with prejudice.

¶2.    Because the circuit judge's findings and conclusions are supported by substantial credible evidence, we affirm.  The circuit judge also correctly applied the plain language of the MTCA in concluding that DRMC was entitled to immunity on Taylor's inadequate staffing claim.  This too is a sufficient, alternative reason to affirm the judgment.

**FACTS AND PROCEDURAL HISTORY**

¶3.    Sometime after 11:00 p.m. on July 5, 2003, LeKenray Taylor was shot in the chest during a drive-by shooting in Rosedale.  Bolivar County Emergency Medical Services was

---

[1] *See* Miss. Code Ann. § 11-46-13 (Rev. 2012) ("The judge . . . shall hear and determine, without a jury, any suit filed under the [MTCA]."); Miss. Code Ann. § 11-46-1(i) (Supp. 2015) (community hospitals are covered by the MTCA).

2

called at 11:17 p.m., and an ambulance arrived at the scene at 11:20 p.m. The ambulance reached the DRMC emergency room in Greenville at 11:56 p.m., and DRMC's trauma team was activated and in place by 11:58 p.m. The on-call general/trauma surgeon, Dr. Allen Billsby, was paged and at the hospital by 12:13 a.m.

¶4. LeKenray had sustained a "massive" gunshot wound to his chest that was gushing blood and air when he arrived at the hospital. The bullet that entered his chest had shattered into pieces and produced a "blast injury." His ribs were "decimated" by the blast and had essentially "exploded" into "shards" and "fragments." The blast also severely damaged the surrounding soft tissue of his chest to the point that a large area of his chest was described as "nothing but a raw bleeding mass." LeKenray's upper right lung was also severely injured and punctured by bullet fragments. The nature and extent of LeKenray's injuries indicated that he had been shot by a high-velocity weapon, such as a rifle.

¶5. Dr. Billsby, a general surgeon, evaluated LeKenray's injuries and quickly determined that he lacked the cardiothoracic training and privileges necessary to perform the surgery that LeKenray needed. Dr. Billsby described the idea of his operating on LeKenray as "unthinkable." Dr. Billsby sought a cardiothoracic consult and evaluation, but no cardiothoracic surgeon was available. Therefore, he began efforts to transfer LeKenray to a hospital with a surgeon who could operate on him. He contacted the "MED" (Regional Medical Center) in Memphis, the University of Mississippi Medical Center in Jackson, and hospitals in Tupelo, Little Rock, and Shreveport. All were fogged in, making air transport impossible, and Dr. Billsby concluded that "ground transport was unthinkable" under the

3

circumstances. Dr. Billsby also tried to locate a private air ambulance or even a military helicopter but to no avail. While transfer options were being explored, the trauma team continued efforts to stabilize LeKenray and keep him alive. Among other procedures, they applied constant direct pressure to the wound to attempt to stop the bleeding, intubated LeKenray, and gave him blood transfusions and IV fluids.

¶6. Around 2:30 a.m., Dr. Hugh Gamble, a thoracic surgeon, learned from his answering service that Dr. Billsby was requesting him in the emergency room. Dr. Gamble had been asleep and was not on call. After talking to Dr. Billsby by telephone, Dr. Gamble arrived at the hospital around 2:58 a.m. Dr. Gamble evaluated LeKenray, discussed the situation with Taylor, who is a nurse, and recommended proceeding to surgery as soon as possible. However, Dr. Gamble warned Taylor that it was "very unlikely" that her son would survive.

¶7. LeKenray was taken into the operating room around 3:50 a.m., and Dr. Gamble, assisted by Dr. Billsby, performed an extensive chest operation in an effort to stop the bleeding. LeKenray survived the surgery, which ended around 6:30 a.m., but his condition remained highly unstable, and Dr. Gamble assessed his chances of survival as virtually nil. LeKenray passed away approximately six hours later despite efforts to resuscitate him.

¶8. On January 28, 2005, Taylor, as the administratrix of LeKenray's estate, filed a complaint alleging negligence against DRMC, Dr. Billsby, and Dr. Gamble. The court later dismissed Taylor's claims against Dr. Billsby and Dr. Gamble because they treated LeKenray in the course and scope of their employment at DRMC and thus were entitled to immunity under the MTCA. *See* Miss. Code Ann. § 11-46-7(2) (Rev. 2012).

¶9.    On February 16, 2005, DRMC served Taylor with discovery requests seeking the identity of each expert witness that she intended to use to support her claim. For almost three years thereafter, Taylor did not respond to DRMC's discovery requests or serve any requests of her own. In January 2008, DRMC moved for summary judgment on the ground that Taylor had no expert witness. Taylor did not timely respond to DRMC's summary judgment motion; instead, on March 20, 2008, she admitted that she had failed to respond to the motion as a result of her counsel's "unconscionable neglect . . . in misfiling [the] motion," and she asked for additional time. Taylor subsequently responded to DRMC's summary judgment motion and attached the affidavit and curriculum vitae of Dr. Francis Evans, a semi-retired general surgeon who presently resides in Florida. Dr. Evans opined that DRMC, which is designated as a "Level II trauma center" under the Mississippi Trauma Care System regulations, should have been prepared to operate on LeKenray "almost immediately after his arrival." In May 2008, the circuit court denied DRMC's motion for summary judgment. The court recognized that Taylor offered "no explanation" for failing to respond to discovery requests and simply admitted to "unconscionable neglect" in failing to respond to the summary judgment motion; however, the court declined to impose the "harsh" sanction of striking Dr. Evans's affidavit and granting summary judgment.

¶10.    In June 2010, after continuing to experience difficulty obtaining discovery responses and deposition dates from Taylor's counsel, DRMC moved to dismiss for failure to prosecute. In November 2010, the circuit court found that there was a "clear record of delay" by Taylor and that she had repeatedly failed to respond to discovery requests until ordered

to do so; however, the court denied the motion to dismiss, conditional on the entry of, and strict adherence to, a scheduling order.

¶11.    In February 2012, DRMC moved for summary judgment, arguing that Dr. Evans's only opinions regarding negligence failed to create a genuine issue of material fact. Dr. Evans opined that DRMC should have had a thoracic surgeon on call and available at all times, but DRMC argued that its staffing decisions were a discretionary function entitled to immunity under the MTCA, Mississippi Code Annotated section 11-46-9(1)(g) (Rev. 2012). Dr. Evans also opined that Dr. Billsby should have operated on LeKenray even though Dr. Billsby concluded that he lacked the necessary training and privileges to perform the operation; however, citing *Lewis v. Soriano*,[2] DRMC argued that a doctor does not commit malpractice by declining to provide treatment that involves a specialty in which the doctor lacks necessary training. The circuit court denied DRMC's motion in August 2012. DRMC filed a petition for an interlocutory appeal, but in December 2012, the Supreme Court denied the petition, with one justice dissenting on the issue of immunity under the MTCA. *Bd. of Trs., Delta Reg'l Med. Ctr., Dist. of Washington Cty. v. Taylor*, 166 So. 3d 480 (Miss. 2012).

¶12.    The case finally proceeded to trial on October 14-16, 2013. Prior to trial, DRMC moved in limine to prevent Taylor from asserting a claim that DRMC violated the trauma care system regulations. DRMC argued that no such claim was alleged in the complaint, which Taylor never moved to amend; that Dr. Evans made only general references to the

---

[2] "No liability attaches to a physician who refuses to treat a patient when the treatment involves a specialty in which he has not had the training necessary to render treatment in that field of medicine." *Lewis v. Soriano*, 374 So. 2d 829, 831 (Miss. 1979).

6

regulations in his 2008 affidavit; and that Taylor did not expressly allege a violation of the regulations until her response in opposition to summary judgment in 2012. The court reserved ruling on DRMC's motion and allowed Taylor to present evidence at trial regarding DRMC's alleged failure to comply with the regulations.

¶13. At trial, the court accepted the transcript and video of Dr. Evans's deposition into evidence. Dr. Evans testified that he had no criticism of Dr. Gamble and that "Dr. Gamble did all he possibly could." Therefore, at trial, Taylor's claim narrowed to focus on DRMC's staffing decisions and Dr. Billsby's alleged actions and inactions prior to Dr. Gamble's arrival. Dr. Gamble testified as both a fact witness and an expert in thoracic surgery, general surgery, emergency medicine, and the state trauma care system regulations. Dr. Roderick Boyd also testified for DRMC as an expert in the fields of general and trauma surgery. Dr. Evans opined that Dr. Billsby should have operated on LeKenray and that DRMC's staffing was insufficient for a Level II trauma center. Dr. Gamble and Dr. Boyd testified that Dr. Billsby acted properly by not operating on LeKenray[3] and that DRMC was appropriately staffed.

¶14. Post-trial, the court entered judgment in favor of DRMC and dismissed the complaint with prejudice. In support of the judgment, the court issued a thorough opinion with findings of fact and conclusions of law. The court concluded that Taylor should not be allowed to

---

[3] Dr. Gamble testified that for Dr. Billsby to have operated on LeKenray "would be the same as me having a patient with a subdural hematoma or blood clot on the brain and deciding that I needed to go drill holes in his skull where I have no training." Dr. Gamble testified that "Dr. Billsby's training was appropriate for the vast majority of chest injuries," but given Dr. Billsby's lack of vascular training and the extensive injuries to LeKenray's blood vessels, Dr. Billsby would have "ma[d]e things a lot worse" by operating.

7

amend her complaint to allege violations of the trauma care system regulations; that even if such an amendment were permitted, DRMC complied with those regulations; and that even if a violation of the regulations had been proven, participation in the trauma care system was voluntary in 2003, and DRMC's staffing decisions were a discretionary function entitled to immunity under the MTCA. Citing *Lewis v. Soriano*, *supra*, the court also found that Dr. Billsby's decision not to operate on LeKenray was not malpractice. The court summarized that the physicians involved "met or exceeded the applicable standard of care in the care and treatment of Mr. Taylor at all times and in all respects" and "that nothing Dr. Billsby or Dr. Gamble did or failed to do proximately caused or contributed to Mr. Taylor's death." Taylor filed a motion to alter or amend the judgment or for a new trial, which the circuit court denied. Taylor then filed a timely notice of appeal.

## ISSUES ON APPEAL

¶15. On appeal, Taylor raises four issues, which we quote below with only minor, non-substantive alterations:

1. Whether the trial court erred in failing to permit an amendment of pleadings.

2. Whether the trial court erred in declaring that [Dr. Evans] was not competent to testify as to any duty imposed on [DRMC] according to its designation as a Level II Trauma Center.

3. Whether the trial court erred in declaring that DRMC . . . met the 2003 requirements for a Level II Trauma hospital.

4. Whether the trial court erred in determining that DRMC was not liable for its own negligence when it failed to provide the services it held itself out to the public that it was capable of providing at its facility without the caveat that the services were only available on limited dates

8

and times.

¶16.    Having reviewed Taylor's brief, we do not discern a challenge to the trial judge's finding that Dr. Billsby met the standard of care and did not commit malpractice by deciding not to operate on LeKenray himself. Accordingly, we do not address that issue. We also pretermit discussion of Taylor's first and second issues. The trial judge found that Taylor's claim would fail on the merits even if he permitted her to amend her complaint and considered Dr. Evans's testimony regarding the trauma care system regulations. Because the trial judge's ultimate findings and conclusions regarding the merits of Taylor's claim are supported by substantial credible evidence, we need not address whether she was entitled to amend her complaint or whether Dr. Evans was qualified to testify regarding the regulations. Rather, taking into account all of the evidence and all of Dr. Evans's testimony, we simply address the trial judge's findings that DRMC (1) met the standard of care and complied with relevant regulations and (2) was entitled to immunity under the MTCA. Either issue is a sufficient basis on which to affirm, and we affirm on both grounds.

**STANDARD OF REVIEW**

¶17.    "The standard of review of a judgment entered following a bench trial is well-settled. The trial court is entitled to the same deference accorded to a chancellor, that is, we will uphold the trial court's findings of fact, so long as they are supported by 'substantial, credible, and reasonable evidence.'" *City of Jackson v. Presley*, 40 So. 3d 520, 522 (¶9) (Miss. 2010) (quoting *City of Jackson v. Brister*, 838 So. 2d 274, 278-79 (¶13) (Miss. 2003)). This deferential standard of review applies to the trial court's determination that DRMC did

9

not breach its standard of care. *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 148 (¶28) (Miss. 2007); *Stanton v. Delta Reg'l Med. Ctr.*, 802 So. 2d 142, 145 (¶6) (Miss. Ct. App. 2001). "The trial judge's conclusions will not be disturbed on appeal where there is substantial supporting evidence in the record, even if [the appellate court] might have found otherwise as an original matter." *Scott Addison Constr. Inc. v. Lauderdale Cty. Sch. Sys.*, 789 So. 2d 771, 773 (¶8) (Miss. 2001). However, immunity under the MTCA is a question of law, which we review de novo. *City of Jackson v. Harris*, 44 So. 3d 927, 931 (¶19) (Miss. 2010).

## ANALYSIS

### I.     Negligence

¶18.    The MTCA waives "the immunity of the state and its political subdivisions from claims for money damages arising out of the *torts* of such governmental entities and the torts of their employees while acting within the course and scope of their employment." Miss. Code. Ann. § 11-46-5 (Rev. 2012) (emphasis added). Thus, "the [MTCA] . . . permits *negligence* actions" against governmental entities such as DRMC. *Jackson Pub. Sch. Dist. v. Smith*, 875 So. 2d 1100, 1102 (¶9) (Miss. Ct. App. 2004) (emphasis added). The MTCA does not grant a plaintiff a right to recover based on a mere violation of a statute or a regulation. *See Hill v. City of Horn Lake*, 160 So. 3d 671, 681 (¶28) (Miss. 2015). Furthermore, the general rule is that "a mere violation of a statute or regulation will not support a claim where no private cause of action exists." *Tunica Cty. v. Gray*, 13 So. 3d 826, 829 (¶16) (Miss. 2009). This "Court will not find a private cause of action when there is no

10

apparent legislative intent to establish one," and "the party asserting a right of action [bears] the burden of establishing the required legislative intent." *Hill*, 160 So. 3d at 681 (¶28) (citing *Tunica Cty.*, 13 So. 3d at 829 (¶¶16-17)).

¶19. In this case, there is no argument or indication that the Legislature intended to create a private right of action to enforce the trauma care system regulations. The regulations are "not a source of tort law to be invoked by private litigants." *Major Mart Inc. v. Mitchell Distrib. Co.*, 46 F. Supp. 3d 639, 656 (S.D. Miss. 2014). If a facility is not in compliance with the regulations, the relevant regulatory agency—the Department of Health (DOH)—may take appropriate corrective action. *See id.* at 655-56. Thus, while the parties have focused on whether DRMC complied with those regulations, the ultimate question in this case is whether DRMC was negligent. The trauma care regulations may inform that inquiry, but a violation would not necessarily establish a breach of the applicable standard of care.

¶20. In 1998, the Legislature amended the Emergency Medical Services Act of 1974, Mississippi Code Annotated sections 41-59-1 to 41-59-85 (Rev. 2013), to create a statewide trauma care system. 1998 Miss. Gen. Laws ch. 429 (H.B. 966). The Legislature directed DOH to "develop a uniform nonfragmented inclusive statewide trauma system that provides excellent patient care." *Id.* at § 2 (amending Miss. Code Ann. § 41-59-5(5)).

¶21. In April 2003, DOH issued regulations "to address each component necessary for [the] development" of such a trauma care system. The regulations were drafted by the Mississippi Trauma Care Advisory Committee, which the Legislature created as a committee of the Emergency Medical Services Advisory Council. *See id.* at § 3 (amending Miss. Code Ann.

11

§ 41-59-7). Dr. Gamble has been a member of the Advisory Committee from 1999 to the present and has served as chairman. At trial, Dr. Gamble was accepted, without objection, as an expert on the state trauma care system and regulations.

¶22. In July 2003, a hospital's participation in the trauma care system was purely voluntary. DOH designated participating hospitals as Level I, II, III, or IV trauma centers based on their resources and ability to treat traumatic injuries. Level I is the highest designation. Even today, there is only one Level I trauma center in the state, the University of Mississippi Medical Center in Jackson. DRMC volunteered to participate in the system and submitted an application to DOH. DOH reviewed DRMC's application and designated it as a "Level II Trauma Center."

¶23. The trauma care system and its governing statutes and regulations have changed over time,[4] but an extended discussion of the subject is unnecessary because Taylor's claim and the evidence at trial primarily relied on one part of the regulations as they existed in July 2003, which we quote below:

> Level II trauma centers *must* maintain published call schedules and have the following specialists immediately available 24 hours/day:
>
> - Emergency Medicine (In-house 24 hours/day)
> - Trauma/General Surgery
> - Anesthesia
>
> The following specialist *should* be on call and promptly available 24 hours/day:

---

[4] In 2008, the Legislature adopted a "play or pay" system under which hospitals with emergency rooms must participate in the trauma care system or pay a "non-participation fee." Non-participation fees, along with other funds, are distributed to participating hospitals. *See generally* 2008 Miss. Gen. Laws ch. 549, § 2 (H.B. 1405) (amending Miss. Code Ann. § 41-59-5); Miss. Admin. Code 15-12-32:1.3.

- Critical Care Medicine
- Hand Surgery
- Microvascular Surgery
- Neurologic Surgery
- Obstetrics/Gynecologic Surgery
- Oral/Maxillofacial
- Orthopedic Surgery
- Plastic Surgery
- Radiology
- Thoracic Surgery

. . . .

A trauma surgeon is presumed to be qualified and have privileges to provide emergency thoracic surgical care to patients with thoracic injuries. If this is not the case, the facility should have a board certified thoracic surgeon immediately available.

The Mississippi Trauma Care System Regulations, Mississippi State Department of Health, April 2003 (emphasis added; footnotes omitted).

¶24. Taylor alleges that DRMC violated this regulation because no thoracic surgeon was on call and promptly available on the night that her son was shot. However, Dr. Gamble—who, as noted above, helped write the regulations—testified that DRMC complied with the regulation by offering all of the "must . . . have" specialists identified in the first paragraph—including Dr. Billsby, who was a qualified trauma/general surgeon. Dr. Gamble testified that Dr. Billsby's qualifications satisfied the final paragraph quoted above because he was qualified "to provide emergency thoracic surgical care to patients with thoracic injuries." Dr. Gamble explained that 94% of thoracic emergencies require emergency surgery no more complicated than the placement of a chest tube—a type of surgery that Dr. Billsby performed routinely, including in this case. Dr. Billsby lacked the necessary training

13

and privileges to operate on LeKenray only because of the extensive and severe nature of the injuries to his chest and blood vessels.

¶25. Dr. Gamble further testified that the specialists listed in the second paragraph "should be" available in the sense that such specialists are desirable—but in 2003, the trauma care system, in which DRMC was a voluntary participant, did not mandate or require that they be on call and available 24/7. Dr. Gamble explained that DRMC did not even have one doctor in some of these specialties, let alone did it have all on call on a 24/7 basis. For example, DRMC had only one thoracic surgeon (Dr. Gamble) and one cardiovascular surgeon. Physicians at DRMC could be required to be on call only ten days per month, which is consistent with good practices.[5] Dr. Gamble testified that, in 2003, only one hospital in the entire State employed all of the specialists that the regulation indicates "should be on call and promptly available [24/7]." He explained that the advisory committee and DOH "designed this system . . . with a full understanding that the physician shortage in Mississippi was real, but it also was important that you couldn't take every injured patient and funnel them to one place. There were too many." That is, for the system to work, some facilities needed to be designated "Level II trauma centers" even though they did not have every specialty that such a hospital ideally "should have." Therefore, DOH reviewed DRMC's application—which listed only one thoracic surgeon on staff—and designated it as a Level II trauma center even though it lacked the capacity to maintain a thoracic surgeon on call 24/7.

---

[5] Stansel Harvey, DRMC's CEO at the time of trial, also testified, "[W]e have a difficult enough time recruiting physicians to the Delta anyway. If we were to tell a physician that you've got to pull call 24 hours a day, seven days a week, they wouldn't do it and couldn't do it."

¶26. In response to the credible testimony of Dr. Gamble and others, Dr. Evans opined that, in his opinion, DRMC should have had a thoracic surgeon on call 24/7—that "somehow or another [DRMC] should not have blanks in the [call] schedule." The trial court found Dr. Gamble's testimony more persuasive than Dr. Evans's and, therefore, found that DRMC was in compliance with the trauma care system regulations in July 2003 and met the applicable standard of care. As Dr. Gamble's testimony was credible and reasonable, the trial judge's findings—and judgment—must be affirmed. *Presley*, 40 So. 3d at 522 (¶9).

## II. Immunity

¶27. The trial judge also found that DRMC was entitled to immunity under Mississippi Code Annotated section 11-46-9(1)(g), which provides that a "governmental entity . . . shall not be liable for any claim . . . [a]rising out of the exercise of discretion in determining whether or not to seek or provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services[.]" This immunity is distinct from the more often discussed discretionary-*function* immunity under the MTCA.[6] Whereas discretionary-function immunity has been the subject of numerous opinions, *see generally Brantley v. City of Horn Lake*, 152 So. 3d 1106, 1111-17 (¶¶16-37) (Miss. 2014), subsection (g) has received relatively little attention.

---

[6] Miss. Code Ann. § 11-46-9(1)(d) ("A governmental entity . . . shall not be liable for any claim . . . [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . .").

¶28.    We agree with the trial judge that the plain language of subsection (g) bars Taylor's claim.  As discussed above, Taylor finds no fault with Dr. Gamble, and on appeal she does not challenge the trial judge's finding that Dr. Billsby's decision not to operate was consistent with the standard of care.  Thus, at this stage, the portion of her claim that remains is that DRMC should have had a thoracic surgeon on call on a 24/7 basis.  However, the trial judge found that DRMC simply lacked the resources necessary to hire additional thoracic surgeons.  The trial judge's finding is supported by the credible testimony of Dr. Gamble and Stansel Harvey, DRMC's CEO at the time of trial, who testified that there was insufficient demand to support additional thoracic surgeons and that the hospital's board of trustees had determined that any available funds should be allocated to upgrading its then-outdated facilities.  As Harvey put it, "hiring additional surgeons if the building falls down is not going to gain you anything."

¶29.    As discussed previously, in July 2003, the trauma care system regulations did not mandate that DRMC have a thoracic surgeon on call on a 24/7 basis.  Nor has Taylor identified any other statute or regulation that would have required DRMC to employ any particular number of thoracic surgeons.  Therefore, whether to devote resources to efforts to recruit and hire such physicians was a decision committed to DRMC's discretion.  Accordingly, we concur with the trial judge that DRMC's decision not to do so is immune from liability under the plain language of subsection (g).

## CONCLUSION

¶30.    There is substantial credible evidence to support the trial judge's findings that DRMC

16

complied with the trauma care system regulations in effect in July 2003 and that Taylor failed to prove negligence, i.e., a breach of any applicable standard of care. Therefore, the judgment in favor of DRMC is affirmed. In addition, the trial judge correctly applied the plain language of the MTCA when he concluded that DRMC could not be held liable for not devoting resources to attempting to hire additional thoracic surgeons. Accordingly, we affirm on this ground as well.

¶31. **THE JUDGMENT OF THE CIRCUIT COURT OF WASHINGTON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., NOT PARTICIPATING.**