# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-01009-SCT

*J.S., A MINOR, BY AND THROUGH JAMES*
*SEGROVES AND YAN PING ZHONG, HER*
*NATURAL GUARDIANS AND NEXT FRIENDS*

*v.*

*OCEAN SPRINGS SCHOOL DISTRICT*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/19/2022 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| TRIAL COURT ATTORNEYS: | JIM L DAVIS, III |
| | ROBERT W. WILKINSON |
| | NICOLE WALL SULLIVAN |
| | WILLIAM ROBERTS NORMAN |
| | ANN LANDGRAF GRIFFIN |
| | JOSEPH O'CONNELL |
| | VICTORIA JONES RAINS |
| | BRIAN CHRISTOPHER WHITMAN |
| | MATTHEW G. MESTAYER |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MATTHEW G. MESTAYER |
| | BRIAN CHRISTOPHER WHITMAN |
| ATTORNEYS FOR APPELLEE: | JOSEPH O'CONNELL |
| | ANN LANDGRAF GRIFFIN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART, REVERSED IN PART, AND REMANDED - 04/03/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. Eight-year-old J.S. was sexually battered by her bus driver, Sergio Sandoval, numerous times to and from school for more than a month. J.S., through her parents, brought the following claims under the Mississippi Tort Claims Act against the Ocean Springs School

District in the Jackson County Circuit Court: (1) negligence; (2) negligent hiring, retention, supervision, and training; (3) failure to adopt, implement, and/or follow policies and procedures; (4) negligent infliction of emotional distress; and (5) civil assault, civil battery, and false imprisonment. The Jackson County Circuit Court found that the District was entitled to discretionary-function immunity under the Mississippi Tort Claims Act and that the bus driver's criminal conduct was otherwise not reasonably foreseeable because the District lacked notice of his abusive proclivities. The plaintiff appealed. As more fully set forth below, we reverse the trial court's grant of summary judgment, holding that most of the plaintiff's claims against the District are not barred by sovereign immunity and that the plaintiff has demonstrated a genuine issue of material fact regarding foreseeability.

## BACKGROUND

¶2. From September 15, 2014, to October 7, 2014, Sergio Sandoval, a bus driver for Oak Park Elementary School, sexually assaulted and battered eight-year-old J.S. more than thirty times to and from school. On the evening of October 7, 2014, J.S. reported the abuse to her parents, and her father, James Segroves, alerted the police and then informed the school's principal, Jennifer Pope. The next morning, Sandoval was immediately ordered to leave the school premises. Sandoval's transportation supervisor, Tim Weimer, pulled the hard drive from Sandoval's bus and observed video footage of Sandoval calling J.S. to the front of the bus while *en route* in violation of school policy. As a result, Sandoval was terminated on October 8, 2014, and later was convicted of touching a child for lustful purposes and sexual battery.

2

¶3.    The plaintiff filed her initial complaint against the Ocean Springs School District on October 26, 2020, and her second amended complaint on December 16, 2021. The plaintiff brought the following claims in the Jackson County Circuit Court against the District under the Mississippi Tort Claims Act: (1) negligence; (2) negligent hiring, retention, supervision, and training; (3) failure to adopt, implement, and/or follow policies and procedures; (4) negligent infliction of emotional distress; and (5) civil assault, civil battery, and false imprisonment. Essentially, the plaintiff alleged that Sandoval's conduct was imputed to the District; that the District breached its duty to provide a safe school environment; that the District failed to use reasonable care in hiring, training, and supervising Sandoval; and that the District's negligence inflicted emotional distress.

¶4.    The District filed its answer to the second amended complaint on January 6, 2022, and denied all liability. The District then filed a motion for summary judgment on July 29, 2022. In support of its motion, the District attached the affidavits of Brooks McKay, the District's director of operations, and Weimer, as well as its transportation handbook, employee handbook, the Mississippi Pupil Transportation Handbook, the District's policies on sexual harassment, and Sandoval's personnel file. McKay stated that "[he] never observed, heard, or otherwise became aware of any incident or development involving Mr. Sandoval that foreshadowed, or even vaguely or remotely suggested, the possibility of any type of sexual misconduct with a student, either on a school bus or anywhere else."

¶5.    McKay further stated that if anyone had complained about Sandoval having any sort of inappropriate contact with a student, it would have been documented in Sandoval's

personnel file but that his file contained no such concerns. Rather, the only complaints in Sandoval's personnel file "all pertained in some way or another to misbehavior or misconduct by students." The first documented incident in Sandoval's file recorded in 2008 pertained to a student who was written up for disrespectful behavior, and the student's mother complained that other students who acted similarly were not written up. McKay testified that, in response to the complaint, the video footage from Sandoval's bus was reviewed and that Sandoval's supervisor, Charles Lee, found that Sandoval was "fair to each and every one of the students."

¶6. The next incident documented in Sandoval's personnel file took place in 2009 when Sandoval reported two brothers who were disrespectful and threatened him with physical violence. In response, the District interviewed and obtained statements from several students, and the students reported "issues about an alleged attempt by the brothers' mother to remove them from the bus, the speed at which Mr. Sandoval drove, and the way he traveled around corners." Finally, in 2013, two mothers requested that their children be moved to different seats on the bus because they were being bullied by other students. One mother pointed out that her son was moved for using inappropriate language but was not moved when he was being bullied. In response, Sandoval moved the two students as requested. McKay emphasized that prior to the events at issue in the present case, the school had not received any complaints or causes for concern about Sandoval having inappropriate contact with a student.

¶7. McKay further described how the District conducts a criminal background check for

4

each bus driver application, as required under the District's transportation handbook. The background check surveys Mississippi criminal history, FBI records, as well as the Mississippi Department of Human Services' Child Abuse Registry. McKay stated that Sandoval's background check did not reveal any concerns, and the school also reviewed his employment history per its transportation handbook.

¶8. McKay also elaborated on Sandoval's training, which included initial and annual certification by the Mississippi Department of Education, also required under the transportation handbook; Sandoval repeated the certification in 2006, 2007, 2009, 2012, and 2014. McKay further stated that in addition to the bus driver certifications, Sandoval also participated in service training through the District related to both general and specific duties as a bus driver. Additionally, Sandoval was evaluated each year by his transportation supervisor, Tim Weimer. McKay stated that Weimer occasionally rode with Sandoval on his bus routes without providing Sandoval notice. The annual evaluations "covered all aspects of a school bus driver's job, ranging from the details of operating a bus to the manner of responding to certain conditions in a roadway to the maintenance of discipline and order among the students on the bus, including the need to keep them seated until the bus was at a complete stop." McKay reported that Sandoval's evaluations were satisfactory each year and that if they had not been, Sandoval's transportation supervisor would have reported the unsatisfactory evaluation to him. Moreover, McKay stated that, when periodically asked about the bus drivers, Weimer described Sandoval as "a careful, dependable bus driver who performed his job properly."

5

¶9. McKay described that, in addition to the annual performance evaluations, Sandoval's driving record was reviewed by the Mississippi Department of Public Safety each year, and he was subject to random drug and alcohol screens; McKay attested that Sandoval never had a record of citations and always tested negative for drugs and alcohol.

¶10. Finally, McKay described the camera system on the school buses. He stated:

> As the system continues to operate day after day, images from one day are eliminated and those from the current day are added. Since OSSD operates over 50 school buses on a daily basis, and since each bus travels for hours each day, the total number of video footage generated by all buses combined runs well over 100 hours a day.

> [T]he video is consulted if and when it can be helpful in investigating what transpired after a report or complaint concerning an incident or accident is received and certain issues then arise. . . . Economically, OSSD does not possess the resources in money or staff that would be needed to review hours and hours of video on a routine basis for such a purpose . . . .

McKay stated that the only time a driver's bus video is reviewed is during the bus driver's annual evaluation, and usually only one route is reviewed.

¶11. Weimer stated that prior to October 8, 2014, he thought that Sandoval was reliable, that he performed satisfactorily, and that he never received a concerning complaint about Sandoval. Thus, Weimer concluded that he "did not have any reason to believe or suspect" that Sandoval had any criminal proclivities.

¶12. In its memorandum in support of its motion for summary judgment, the District stated that "the gravamen of each of [the plaintiff's] four (4) claims or counts against the District is that it failed to take action that would have allegedly prevented Mr. Sandoval's criminal misconduct." The District declared that the alleged actions or inactions that the plaintiff

6

relies on involved choices or judgments grounded in public policy; thus it possesses discretionary-function immunity and cannot be held liable for Sandoval's actions. The District also maintained even if it was not immune from the plaintiff's claims of negligence, her claims still failed for lack of foreseeability.

¶13. In response to the District's motion for summary judgment, the plaintiff argued that the District had a ministerial duty to provide a safe school environment and pointed to the testimony of several District administrators and former employees who all similarly stated that J.S. was not provided a safe environment. The plaintiff further argued that the duty to provide a safe environment does not involve choice or judgment and that "there are no social, economic, or political-policy considerations to be made when determining whether to provide a safe school environment." Thus, the plaintiff urged that there were genuine issues of material fact, such as whether the District exercised ordinary care in performing its alleged ministerial duties, that precluded summary judgment.

¶14. The Jackson County Circuit Court conducted a hearing on the motion on December 15, 2022, and issued its order in the District's favor on December 19, 2022. In its judgment, the circuit judge granted summary judgment for the following reasons:

  1) under the provisions of Miss. Code Ann. § 11-46-5(2) and applicable caselaw, OSSD is shielded from liability for the sex crimes of co-defendant Sergio Sandoval, at issue in this case;

  2) under the provisions of Miss. Code Ann. § 11-46-9(1)(d) and applicable caselaw, OSSD possesses discretionary immunity as to all claims asserted against it by plaintiff; and

  3) in addition to the existence of discretionary immunity, plaintiff's claims against OSSD also fail, because it lacked actual or constructive notice

7

of any sex crimes committed by Mr. Sandoval or any related proclivities that he possessed, and his actions toward the minor, J.S., were not reasonably foreseeable to OSSD.

¶15. The plaintiff filed her notice of appeal on September 6, 2023, asking the Court to consider whether the circuit court erred by granting summary judgment in the District's favor and finding (1) that the District possessed discretionary immunity as to all claims, (2) that Sandoval's abuse was not reasonably foreseeable, and (3) that the District lacked notice of Sandoval's proclivities. We hold that the plaintiff has demonstrated a triable issue of fact as to proximate-cause foreseeability, and we hold that many of the plaintiff's claims are not barred by discretionary-function immunity.

**STANDARD OF REVIEW**

¶16. As questions of law, the Court reviews both a trial court's award of summary judgment and a trial court's determination that a governmental entity is immune under the Mississippi Tort Claims Act *de novo*. ***Boroujerdi v. City of Starkville***, 158 So. 3d 1106, 1109 (¶ 7) (Miss. 2015), *overruled on other grounds by* ***Wilcher v. Lincoln Cnty. Bd. of Supervisors***, 243 So. 3d 177 (Miss. 2018). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[.]'" ***Collins v. City of Newton***, 240 So. 3d 1211, 1216 (¶ 11) (Miss. 2018) (alteration in original) (quoting Miss. R. Civ. P. 56(c)). Moreover, "[t]he evidence must be viewed in the light most favorable to the opposing party." ***Id.*** (citing ***Duckworth v. Warren***, 10 So. 3d 436-37 (¶ 9) (Miss. 2009)). "[T]he nonmoving party 'must set forth specific facts showing that there is

8

a genuine issue for trial,' and cannot simply 'rest upon the mere allegations or denials of his pleadings.'" *Boroujerdi*, 158 So. 3d at 1109 (¶ 7) (quoting Miss. R. Civ. P. 56(e)).

## DISCUSSION

### I. The Mississippi Tort Claims Act bars the plaintiff's claims in part.

¶17. In each of her claims against the District, the plaintiff asserts, in essence, that the District was negligent in hiring, training, supervising, and retaining Sandoval and for failing to implement policies to detect and prevent child abuse and that such negligence was a cause-in-fact of the abuse Sandoval inflicted on the plaintiff. However, even if the District was negligent, it maintains that if the actions and inactions complained of are deemed discretionary, then it cannot be held liable under Mississippi Code Section 11-46-9(1)(d) of the Mississippi Tort Claims Act. The plaintiff, on the other hand, argues that by negligently hiring, training, supervising, and retaining Sandoval, as well as failing to establish policies to detect and prevent child abuse, the District failed to perform its statutory and self-imposed ministerial duties to ensure a safe school environment.

¶18. To set the stage, we first address *Wilcher v. Lincoln County Board of Supervisors*, 243 So. 3d 177 (Miss. 2018), wherein we returned to the two-part public-policy function test to determine the applicability, if any, of discretionary immunity. In order for the political subdivision in question (here, the District) to enjoy discretionary function immunity, two things must be true: (1) the allegedly tortious activity must involve elements of choice or judgment, and (2) the Court "must decide whether that choice or judgment involved social, economic, or political-policy considerations." *Id.* at 187 (¶ 30) (quoting *Miss. Transp.*

9

*Comm'n v. Montgomery*, 80 So. 3d 789, 795 (Miss. 2018), *overruling recognized by*
*Federinko v. Forrest Cnty.*, 381 So. 3d 343 (Miss. 2024)).

### A. The duty to ensure a safe school environment involves elements of choice and judgment and is not ministerial in nature.

¶19. The plaintiff argues that the District does not enjoy discretionary-function immunity because there is no choice in how to provide a safe environment, and the District failed in its duty to do so because it clearly did not provide a safe school environment for J.S. The Jackson County Circuit Court agreed with the District, concluding that all claims asserted against it by the plaintiff were discretionary, so the District was shielded from liability.

¶20. The Mississippi Tort Claims Act "provides the exclusive civil remedy against a governmental entity . . . for acts or omissions which give rise to a suit." *Smith ex rel. Smith v. Leake Cnty. Sch. Dist.*, 195 So. 3d 771, 774-75 (¶ 9) (Miss. 2016) (alteration in original) (internal quotation marks omitted) (quoting *L.W. v. McComb Separate Mun. Sch. Dist.*, 754 So. 2d 1136, 1138 (Miss. 1999), *overruled on other grounds by Montgomery*, 80 So. 3d 789). Pursuant to the Mississippi Tort Claims Act, school districts, as government entities, are exempt from liability under Mississippi Code Section 11-46-9(1)(d) for any claim "[b]ased on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused[.]" Miss. Code Ann. § 11-46-9(1)(d) (Rev. 2019). A discretionary function concerns a "choice or judgment involv[ing] social, economic, or political-policy considerations." *Wilcher*, 243 So. 3d at 187 (¶ 12) (citing *Montgomery*, 80 So. 3d at 795).

¶21. Discretionary duties require officials to rely on "judgment and discretion in the

performance thereof." ***T.M. v. Noblitt***, 650 So. 2d 1340, 1343 (Miss. 1995) (citing ***Poyner v. Gilmer***, 171 Miss. 859, 158 So. 922, 923 (1935)), *abrogated by **State v. Bayer Corp.***, 32 So. 3d 496 (Miss. 2010). Discretionary immunity considers "those governmental decisions in which, to be effective, the decision-maker must look to considerations of public policy and not merely to established professional standards or to standards of professional reasonableness." ***Robinson v. Indianola Mun. Separate Sch. Dist.***, 467 So. 2d 911, 915 (Miss. 1985) (quoting ***Pruett v. City of Rosedale***, 421 So. 2d 1046, 1052 (Miss. 1982), *superseded by statute as stated in **Jackson v. Daley***, 739 So. 2d 1031 (Miss. 1999)).

¶22. First, the Court must identify "the specific activity in question, because it is the *performance* of a discretionary function that is guaranteed immunity." ***Brantley v. City of Horn Lake***, 152 So. 3d 1106, 1120 (¶ 47) (Waller, C.J., concurring), *overruled by **Wilcher***, 243 So. 3d at 188-89 (¶ 36); Miss. Code Ann. § 11-46-9(1)(d). Based on the plaintiff's complaint, her claims fall into two basic categories. First, she alleges negligence in hiring, retaining, training, and supervising Sandoval. Second, the plaintiff alleges negligence because the District failed to adopt and implement preventative policies, all of which purportedly led to Sandoval's abuse. As to the former category of claims, the allegations are not defeated at the summary judgment stage by discretionary-function immunity. The latter category, however, which involves the school district's policy-making function, is.

¶23. Acts performed in furtherance of ministerial duties do not enjoy immunity. ***Little v. Miss. Dep't of Transp.***, 129 So. 3d 132, 136 (¶ 8) (Miss. 2013). A duty is ministerial when it "has been positively imposed by law and its performance required at a time and in a

11

manner or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion . . . ." *Mohundro v. Alcorn Cnty.*, 675 So. 2d 848, 853 (Miss. 1996) (alteration in original) (quoting *Coplin v. Francis*, 631 So. 2d 752, 754 (Miss. 1994), *overruled on other grounds by Little*, 129 So. 3d at 138 (¶ 11)). If the action is ministerial, "it is then protected from liability only if ordinary care is exercised in performing or failing to perform the statutory duty or regulation." *Covington Cnty. Sch. Dist. v. Magee*, 29 So. 3d 1, 5 (¶ 8) (Miss. 2010) (quoting *Stewart ex rel. Womack v. City of Jackson*, 804 So. 2d 1041, 1048 (Miss. 2002)). Thus, the distinction between a discretionary function versus a ministerial duty hinges on whether an element of choice exists in the performance thereof.

¶24. The plaintiff first relies on Mississippi Code Section 37-9-69, which states:

> It shall be the duty of each superintendent, principal and teacher in the public schools of this state to enforce in the schools the courses of study prescribed by law or by the state board of education, to comply with the law in distribution and use of free textbooks, and to observe and enforce the statutes, rules and regulations prescribed for the operation of schools. Such superintendents, principals and teachers shall hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess.

Miss. Code Ann. § 37-9-69 (Rev. 2019). Section 37-9-69 has been interpreted to "create[] a ministerial duty wherein 'public schools have the responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment.'" *Moss Point Sch. Dist. v. Stennis*, 132 So. 3d 1047, 1050 (¶ 13) (Miss. 2014) (quoting *Henderson ex rel. Henderson v. Simpson Cnty. Pub. Sch. Dist.*, 847 So. 2d 856, 857 (Miss. 2003)); § 37-9-69.

¶25.    Based on the above statute and other various school polices, the plaintiff concludes that the District had a statutory and self-imposed duty to ensure a safe school environment and that it breached that duty by failing to adopt and implement policies and procedures, such as adequately hiring, training, and supervising school bus drivers, that would have prevented Sandoval's abuse.  The plaintiff maintains that the District is not shielded from liability because "all acts fulfilling [a ministerial] duty are considered mandated as well, and neither the government nor its employees enjoys immunity." *Montgomery*, 80 So. 3d at 798 (¶ 31). Thus, she contends there is no discretion whatsoever involved in providing a safe school environment because all acts necessary to provide a safe environment are also mandated.

¶26.    However, this cannot be the case because, as stated above, for an act to be ministerial, the controlling statute and/or policies must detail how the duty is "to be performed at a specific time and place, removing an officer's or entity's choice or judgment." *Id.* at 795 (¶ 19) (quoting *Magee*, 29 So. 3d at 5).  The plaintiff does not identify any authority that specifically states how the school is to provide a safe environment in such a way as to completely remove the school's judgment in the matter.  Indeed, hiring and supervising employees, as well as creating and implementing school policies, necessarily require the school to use its judgment and make various choices.

¶27.    Further, the Court has previously held that there is a duty to provide a safe school environment, but again, the duty is "to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment." *Smith*, 195 So. 3d at 777 (¶ 17) (internal quotation marks omitted) (quoting *Stennis*, 132 So. 3d at

13

1050). Additionally, the statute itself only directs schools to "hold the pupils to strict account[.]" § 37-9-69. A school cannot be held liable for each and every harm that befalls a student, as the plaintiff suggests; a school district performs its duty to provide a safe school environment by using ordinary care and curtailing foreseeable risks to its students.

¶28. The District suggests that Section 37-9-69 is applied in limited contexts, usually assaults between students, as the statute only positively instructs schools to "hold the *pupils* to strict account." § 37-9-69 (emphasis added). The District further asserts that Section 37-9-69 has never been extended in such a blanket fashion, as suggested by the plaintiff, to cover a government entity's decisions in hiring, supervising, and retaining employees. *Noblitt*, 650 So. 2d at 1344 ("duty to hire and supervise employees is necessarily and logically dependent upon judgment and discretion"); *City of Clinton v. Tornes*, 252 So. 3d 34, 39 (¶ 22) (Miss. 2018) (police departments exercise discretionary immunity in the supervision, discipline, and regulation of police officers); *Magee*, 29 So. 3d at 6 (¶ 13) (coordinating and supervising athletic practices are discretionary acts as there are no statutes or regulations mandating specific action).

¶29. The plaintiff also argues that, aside from Section 37-9-69, the District's own policies created specific ministerial duties. Other than the District's policy requiring a criminal background check as a prerequisite for performance, with which the District complied, no other policies rise to the level of specificity required to impose ministerial duties.

¶30. First, the plaintiff claims that various school policies also require the District to ensure that students are provided with a safe school environment. The plaintiff points to one policy

that sets a goal "[t]o provide a safe environment that reduces the risk factors, increases protective factors, and develops life-long learners."  Another policy directs the school board to "[e]nsure that a safe and appropriate educational environment is provided to all students."  Based on these policies, the plaintiff asserts that the District was clearly and unequivocally "required to design a school safety plan which ensured a [safe] school environment . . . [T]he District did not have any choice or discretion in implementing these mandatory policies and fulfilling its ministerial duties."

¶31.    In response, the District contends that it is not the ensurer of students' safety and that it is not liable for all harm to students.  The District further argues that it is unfeasible "that it should anticipate and prevent virtually any and every conceivable harm a student might encounter, even, as here, where it has no knowledge that a problem exists or any related cause for concern."  The District further argues that, if the plaintiff is correct, then school districts would always be held liable for negligence in personal injury cases.  Finally, the District argues that its policies merely prescribe goals, and they in no way detail the specific acts required to create a ministerial duty that allows no element of choice.

¶32.    The plaintiff also relies on *Cornell v. Mississippi Department of Human Services*, 374 So. 3d 1217 (Miss. Ct. App. 2023), in which the Mississippi Department of Human Services (MDHS) was found to have breached its ministerial duty to conduct routine visits of children in foster care as imposed by law and its own policies.  However, unlike in the case *sub judice*, MDHS's policy specifically dictated the action it was required to take, as the Court of Appeals noted:  the "operating procedure is outlined in detail in . . . [M]DHS's

15

policy manual." *Cornell*, 374 So. 3d at 1228 (¶ 49) (internal quotation mark omitted). Here, neither the statute nor the policies the plaintiff cited outline in detail specific actions that the District was required to take.

¶33. The plaintiff next asserts that the District's policies created a ministerial duty to implement guidelines and rules to identify child predators and prevent child abuse. In addition to conducting "periodic in-service programs for all staff, in an effort toward making staff members more sensitive to the issues involved in child abuse and neglect[,]" District policy states:

> The [Ocean Springs School District Board of Trustees] also believes in a positive and preventative approach toward child abuse and neglect. Therefore, the [Ocean Springs School District Board of Trustees] endorses periodic in-service programs for all staff, in an effort toward making staff members more sensitive to the issues involved in child abuse and neglect. The [Ocean Springs School District] Superintendent of Schools or designee is hereby directed to develop administrative guidelines necessary to implement this policy.

¶34. The District contends that the plaintiff misconstrues the context of the policies, which are both referencing child neglect and abuse at the hands of parents or guardians, not sexual misconduct by District employees. The District has separate policies regarding sexual misconduct, and the procedures listed dictate what action is to be taken *after* the school becomes aware of the conduct. With respect to the plaintiff's argument that the District should have adopted additional policies, the District counters that a decision whether to adopt additional policies would "epitomize local judgment and choice" and is clearly subject to discretionary immunity.

¶35. Additionally, the plaintiff argues that the District also had a ministerial duty to

adequately supervise its school buses pursuant to a District policy that states: "[t]he Director of Physical Plants and Transportation shall provide for adequate supervision of students using the pupil transportation system in compliance with all laws, rules and regulations of the State Board of Education which governs pupil transportation." The plaintiff asserts that the policy's language is clearly mandatory, not discretionary, and it is evident that the District failed in fulfilling the duty because the atmosphere on Sandoval's bus was chaotic, and such an environment facilitated J.S.'s abuse.

¶36. The District reiterates that supervision of its employees is discretionary because the above policy did not specify the manner in which transportation was to be supervised other than requiring compliance with the laws and regulations of the State Board of Education, and the plaintiff failed to identify any law, rule, or regulation with which the District may have not complied in supervising its school bus system.

¶37. Finally, the plaintiff argues that the District also failed to comply with the ministerial duty in another of its policies, which directs the school to "establish procedures to assure that all the District employees comply with [the Mississippi Professional Educator Code of Ethics and Standards of Conduct]." The policies listed procedures including "[p]roviding all employees with a copy of the Mississippi Educator Code of Ethics and Standards of Conduct; [m]aintaining a signed statement in each employee's personnel file verifying that he or she has been given notice of the Mississippi Educator Code of Ethics and Standards of Conduct; and [p]roviding annual in-service training for all employees on the Mississippi Professional Educator Code of Ethics and Standards of Conduct."

¶38. The plaintiff asserts that the District did not fulfill these duties because Sandoval only signed a "Non-Exempt At-Will Statement of Assignment with the Ocean Springs School District" that states: "All employees must comply with the Ocean Springs School District Policies and the Mississippi Educator Code of Ethics and Standards of Conduct. Both are available from our District website at www.theDistrictms.org." Thus, the plaintiff argues that Sandoval was not actually provided with a copy of the code as required by the policy. Further, the plaintiff points out that Sandoval signed the document on August 20, 2014, eight years after he was hired and that such a delay, in their view, clearly violates the alleged ministerial duty. Finally, the plaintiff argues that the District also failed to fulfill the alleged duty by not providing Sandoval with training on the code.

¶39. The District, on the other hand, argues that it did satisfy the procedures of the policy by obtaining Sandoval's signed statement acknowledging that he must comply with the District's policies and the code of ethics provided on the school's website. Again, the policy lacks sufficient specificity to eliminate the school district's discretion and choice in implementation.

¶40. The plaintiff failed to identify any authority that details actions performed at a specific time and place to such a degree that the District's choice or judgment is removed. Each of the specific acts complained of involves choice or judgment.

**B. Not all of the allegedly negligent acts and omissions of the District involved social, economic, or political-policy considerations.**

¶41. However, the existing element of choice or discretion is not enough for discretionary immunity to apply; "this Court also must decide whether that choice or judgment involved

18

social, economic, or political-policy considerations." *Wilcher*, 243 So. 3d at 182 (¶ 12) (citing *Montgomery*, 80 So. 3d at 795 (¶ 20)).

¶42.    The District argues that its school bus program necessarily revolves around policy considerations and choices regarding how best to utilize and apply the available funds.  In his deposition, McKay, the District's director of operations, described the District's various considerations in running its bus program:

> For a school district like OSSD that services a large geographic area, a significant portion of its annual budget is devoted to a school bus program through which large numbers of students are transported to schools and then back again.  The cost of operating such a program is sizeable, and for that reason a school district has to make choices and judgments about how available funds are utilized and applied.  Every school bus program addresses a number of concerns and objectives: hiring, training, evaluating, and supervising capable school bus drivers; designing and utilizing efficient bus routes . . . and maintaining and repairing the buses themselves.
>
> Yet because every school district's resources are limited, each district has to make choices and judgments about how resources are applied in addressing and attempting to balance the foregoing concerns and objectives, and those choices and judgments definitely impact economic and social policies.  If consideration needs to be given, for one reason or another, to increasing the sums allocated to a school bus program, then some consideration also has to be given to increasing taxes or reducing the budgets allocated to educational and athletic programs.  As a result, the choices and judgments that a particular school district makes are a reflection of its efforts to consider applicable standards and balance various social and economic concerns and objectives with the extent to which risks and potential dangers are likely to exist without certain action.

¶43.    The same considerations exist with respect to hiring, retaining, and supervising school bus drivers, and choices and judgments simply must be made that affect economic, social, and political concerns.  The District supervisors and directors must make judgment calls on how to evaluate drivers' performances, "and there are no specific laws, policies or

19

regulations that specifically dictate how such monitoring and supervision should be undertaken and performed or how the continued existence of good moral character should be assessed." Further, as the District noted in its motion for summary judgment, "aside from the prohibitions on employing persons convicted of certain crimes," there is no statutory guidance on exactly how school districts should assess whether an individual is of good moral character, whether an individual is suited for employment as a bus driver, or whether an individual performs adequately as a bus driver. Therefore, such determinations are clearly reserved to the school district's judgment and discretion.

¶44. In response, the plaintiff essentially ends her argument with the first prong, whether the actions at issue involved choice or judgment, and she argues only that "there are no social, economic, or political-policy determinations to be made when determining whether to provide a safe school environment. Such an environment must be 'ensured' by the District. The District failed in this regard." The plaintiff also attempts to combat the District's lengthy discussion on the many considerations at play in operating its school bus program, primarily financially, by arguing that the mere fact that there are budgetary considerations involved does not make the activity discretionary.

¶45. The demarcation point between governmental acts that involve "social, economic, or political-policy considerations[,]" *Wilcher*, 243 So. 3d at 182 (¶ 12), and those that do not has bedeviled the Court. *See Smith v. Miss. Transp. Comm'n*, 292 So. 3d 231, 236 (¶ 19) (Miss. 2020) (Coleman, J., concurring). In *Wilcher* itself, the Court noted with disfavor our earlier holding in *Pratt v. Gulfport-Biloxi Regional Airport Authority*, 97 So. 3d 68 (Miss.

2012), *abrogated by Wilcher*, 243 So. 3d at 188 (¶ 33). In **Pratt**, the Court held that a decision regarding the placement of anti-slip tape on metal stairs used in boarding and de-boarding an airplane involved sufficient public-policy considerations as to invoke discretionary-function immunity. **Pratt**, 97 So. 3d at 75 (¶ 18). The **Wilcher** Court admonished that, in order to avoid another **Pratt**, we "must distinguish between *real policy decisions* implicating governmental functions and *simple acts of negligence* which injure innocent citizens." **Wilcher**, 243 So. 3d at 188 (¶ 34) (quoting **Pratt**, 97 So. 3d at 76 (¶ 23) (Waller, C.J., dissenting)).

¶46. The **Wilcher** Court provided guidance, applicable here, for the process of distinguishing between real policy decisions and simple acts of negligence.

> This Court found significant that "[t]he United States Supreme Court has recognized that [while] the majority of acts in the day-to-day operations of governmental activities involve the exercise of some form of discretion, . . . not all of these acts are protected under the exception." [**Jones v. Miss. Dep't of Transp.**, 744 So. 2d 256, 260 (Miss. 1999).] Instead, "only those functions which by nature are policy decisions, whether made at the operational or planning level, are protected." *Id.* (citing **United States v. Gaubert**, 499 U.S. 315, 322, 111 S. Ct. 1267, 1273, 113 L. Ed. 2d 335 (1991)). This is because "the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." **Gaubert**, 499 U.S. at 323, 111 S. Ct. at 1273 (quoting **United States v. Varig Airlines**, 467 U.S. 797, 814, 104 S. Ct. 2755, 2765, 81 L. Ed. 2d 660 (1984)).

*Wilcher*, 243 So. 3d at 182 (¶ 11) (first, second, and third alterations in original). Indeed, drawing the line between policy decisions with an eye toward preventing judicial second-guessing of legislative and administrative decisions conforms to some of our earliest cases on discretionary-function immunity in the context of sovereign immunity. Before the

21

Legislature enacted the Tort Claims Act, the Mississippi Supreme Court abolished sovereign immunity in **Pruett**, 421 So. 2d 1046. Even as the Court abolished sovereign immunity, it protected what the Tort Claims Act would later term discretionary functions. *See* **Robinson**, 467 So. 2d at 915.

> The reasonable man standard of tort law is not an appropriate measure for the political, social, or economic desirability of government programs *and the methods selected for pursuing them*. State tort standards cannot adequately control those governmental decisions in which, to be effective, the decision-maker must look to considerations of public policy and not merely to established professional standards or to standards of professional reasonableness.

**Pruett**, 421 So. 2d at 1052 (emphasis added). Pursuant to the above-described history, five justices of the Court agreed that in order to enjoy discretionary-function immunity, a decision must "be one made by a policymaker that affects or sets public policy." **Smith**, 292 So. 3d at 237 (¶ 21) (citing **Wilcher**, 243 So. 3d at 188).

¶47. In summary, the Court has established that, going forward, we must distinguish between real policy decisions made by policymakers and simple negligence. Although history shows it is not an easy task, we can find guidance in the **Wilcher** Court's citation with approval of the distinction between "functions which by nature are policy decisions" and those that are not. **Wilcher**, 243 So. 3d at 182 (¶ 11). Finally, we can look back the earliest days of the weakening of sovereign immunity in Mississippi and the Court's distinguishing of the "methods selected for pursuing" governmental programs. *Id.* at 192 (¶ 50) (Kitchens, P.J., concurring) (citing **Pruett**, 421 So. 2d at 1051-52).

¶48. It is evident that the basis of the plaintiff's claims regarding the District's

implementation of its own preventative policies and its policies regarding hiring, training, retaining, and evaluating its employees involve actions that require significant amounts of choice and judgment, which necessarily revolve around numerous social, economic, and political-policy considerations. The District's decisions in the realm of setting its own preventative policies are the epitome of selecting methods to pursue governmental functions. They are, by nature, policy decisions. Accordingly, summary judgment in favor of the school district on grounds of discretionary-function immunity is appropriate as to the plaintiff's claim that the District failed to adopt sufficient policies.

¶49. However, the plaintiff's claims regarding the District's actions in hiring, training, retaining, and supervising Sandoval specifically are pure negligence claims outside the reach of discretionary-function immunity. The general implementation of policies governing the hiring and supervision of employees clearly require an element of choice or judgment, as discussed above, and the choices touch on broad public policy concerns. But the specific choice to hire Sandoval and the choices the District made regarding his training, retention, and supervision, do not involve policy considerations. No policy was set by the District's decision to hire Sandoval or by the decisions made by the district in how to monitor him or to train him.

    **II.**     **The plaintiff has made a *prima facie* showing that her injuries were reasonably foreseeable for the purpose of the proximate cause element of her negligence claim.**

¶50. The circuit court found that, even if the District was not shielded from liability, the plaintiff's claims would still fail because Sandoval's criminal conduct was not reasonably

23

foreseeable. The plaintiff contends the trial court erred, and she argues on appeal that, rather than considering Sandoval's reputation at the school, the circuit court should have focused instead "on whether the resulting danger and harm was foreseeable as a result of OSSD's negligence." The plaintiff argues that "[f]oreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others." *Johnson v. Alcorn State Univ.*, 929 So. 2d 398, 411 (¶ 48) (Miss. Ct. App. 2006) (internal quotation mark omitted) (quoting *Ogburn v. City of Wiggins*, 919 So. 2d 85, 92 (¶ 21) (Miss. Ct. App. 2005)).

¶51. Relying on the above test for foreseeability, the plaintiff asserts that child abuse by an employee was reasonably foreseeable because a person of ordinary intelligence could predict that the District's employees would not be able to detect and prevent child abuse because they were not trained do so. Further, they assert that a person of ordinary intelligence could foresee that an opportunity for crime exists in a chaotic bus environment in which bus drivers were not evaluated and their bus videos were not reviewed.

¶52. The plaintiff also suggests that the Court must consider a "defendant's prior experience, bearing in mind that *what is required to be foreseeable is the general nature of the event or harm, not its precise manner or occurrence*." *Crain v. Cleveland Lodge 1532, Order of Moose, Inc.*, 641 So. 2d 1186, 1190 (Miss. 1994) (quoting *Onciano v. Golden Palace Rest.*, 268 Cal. Rptr. 96, 99 (Cal. Ct. App. 1990)). Thus, because another employee sexually abused a child three years before, the plaintiff asserts that "[t]o say that it was an unforeseeable risk that an OSSD employee would sexually assault or batter an OSSD student

24

is simply untrue. . . . It happened before; it can happen again." Finally, the plaintiff asserts that there is also evidence of foreseeability based on the District's duty to provide a safe school environment and its sexual misconduct policies.

¶53. The District, on the other hand, argues that the plaintiff's foreseeability arguments rely on an improper legal standard. First, it notes that, in general, "[c]riminal activity, by its deviant nature, is normally unforeseeable." *Crain*, 641 So. 2d at 1190 (alteration in original) (internal quotation marks omitted) (quoting *Papadimas v. Mykonos Lounge*, 439 N.W.2d 280, 283 (Mich. Ct. App. 1989)). The District also asserts that criminal acts break the causal connection, and reasonable foreseeability then hinges on the defendant's actual or constructive knowledge of the wrongdoer's criminal history or such proclivities. *See Double Quick, Inc. v. Moore*, 73 So. 3d 1162, 1167 (¶ 15-16) (Miss. 2011). The District thus purports that the circuit court did not err by concluding that Sandoval's criminal conduct was not reasonably foreseeable.

¶54. A defendant is not liable for the criminal act of a third party "*if the criminal act is not within the realm of reasonable foreseeability.*" *Id.* (¶ 15) (emphasis added) (quoting *O'Cain v. Harvey Freeman & Sons, Inc.*, 603 So. 2d 824, 825 (Miss. 1991)). Whether a criminal act is foreseeable depends on the specific facts of the case. *Williams ex rel. Raymond v. Wal-Mart Stores E., L.P.*, 99 So. 3d 112, 118 (¶ 21) (Miss. 2012) (citing *Robinson v. Howard Brothers of Jackson*, 372 So. 2d 1074, 1076 (Miss. 1979)).

¶55. In *O'Cain*, 603 So. 2d at 825, a tenant sued her landlord for emotional distress after the tenant's roommate was raped by a burglar. Evidence indicated that the assailant entered

the women's apartment through a sliding-glass back door. *Id.* The plaintiff alleged that the defendant landlord failed to provide an adequate lock for the sliding-glass back door. *Id.* A locksmith testified to the easily breached nature of many sliding-glass patio doors. *Id.* He inspected the specific sliding-glass door at issue and was able to gain entry without the use of tools by simply raising up on the door. *Id.* at 826. The locksmith had suggested installing a device known as a Charlie bar to other apartment complexes but did not remember so advising the defendant in *O'Cain*. *Id.* The defendant landlord filed a motion for summary judgment, which the trial judge treated as a motion to dismiss for failure to state a claim and granted on the ground that the plaintiff could not state a claim for bystander recovery for emotional distress. *Id.* at 827-28.

¶56. On appeal, the *O'Cain* Court considered the trial judge's additional finding that the burglary and rape were criminal acts that cut off liability. The *O'Cain* Court characterized the trial court's finding and the issue as follows:

> The trial court opinion stated that criminal acts are, by definition, superseding causes. Unfortunately, this approach by the trial court is a little too simple. As a general rule of thumb, criminal acts *can* be intervening causes which break the causal connection with the defendant's negligent act, *if the criminal act is not within the realm of reasonable foreseeability*. *Touche Ross v. Commercial Union Ins.*, 514 So. 2d 315, 324 (Miss. 1987); *Robinson v. Howard Brothers of Jackson, Miss.*, 372 So. 2d 1074, 1076 (Miss. 1979).

*O'Cain*, 603 So. 2d at 830. The *O'Cain* Court concluded that the question of whether the burglary and rape of the plaintiff's roommate were foreseeable criminal acts created an issue of fact that precluded summary judgment. "[T]he question of superseding intervening cause is so inextricably tied to causation, it is difficult to imagine a circumstance where such issue

26

would not be one for the trier of fact." *Id.* (citing *Gibson v. Avis Rent-A-Car System, Inc.*, 386 So. 2d 520, 522 (Fla. 1980), *abrogated on other grounds by Askew v. Fla. Dep't of Child. & Fams.*, 385 So. 3d 1034, 1038 (Fla. 2024)).

¶57.    In the case *sub judice*, it is difficult to see the duty alleged by the plaintiff to be owed by the school district, *i.e.*, to protect her from sexual battery while on a district school bus, as all that different from the duty alleged to be owed in *O'Cain*.  As the *O'Cain* question of the sufficiency of the lock was so intertwined with the nature of the criminal act in question as to create an issue of fact on the issue of whether the burglary and rape were foreseeable, so are the questions raised by the acts of negligence alleged by the plaintiff against the District here.

¶58.    The District points to *Williams*, 99 So. 3d 112, and *Robinson*, 372 So. 2d 1074, as two cases where we held that, as a matter of law, an intervening criminal act was not foreseeable.  However, the nature of the alleged negligent acts in *Williams* and *Robinson* as related to the plaintiff's injuries in the two cases were more separable than they are in the instant case.

¶59.    In *Robinson*, a sales clerk sold a gun and ammunition to a minor, which the minor subsequently used to commit murder.  *Robinson*, 372 So. 2d at 1074.  The Court ruled that, even though the store unlawfully sold the weapon to the minor defendant, the minor's criminal act was not "within the realm of reasonable foreseeability[.]" *Id.* at 1076.  The *Robinson* Court explained that intentional and malicious acts are not as easily anticipated as negligent acts, and "[u]nder all ordinary and normal circumstances, in the absence of any

27

reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law . . . ." *Id.* (quoting William L. Prosser, *Law of Torts* 173, 174 (4th ed. 1971)).

¶60.    Further, the Court considered the particular facts of the case, that the minor had neither a prior criminal record nor a demonstrated propensity to misuse firearms. *Id.* The *Robinson* Court considered those specific facts in contrast to a similar case where the purchaser was an escaped convict with a criminal record. *Id.* (citing *Franco v. Bunyard*, 547 S.W.2d 91 (Ark. 1977). Thus, the Court in *Robinson* concluded that unlike in the *Franco* case, the criminal act before it was not reasonably foreseeable because "there was no showing that [the minor] had a previous criminal record or a propensity for violence." *Id.*

¶61.    Similarly, in *Williams*, a minor enlisted an older friend to purchase a gun and ammunition for him, and the store clerk observed the minor providing his friend with the money for the purchase. *Williams*, 99 So. 3d at 113-14.  Thereafter, the minor shot his mother's boyfriend with the weapon and pled guilty to manslaughter. *Id.* at 114-15.  The Court relied on *Robinson* and held that "[i]n cases like the one before us, a minor's criminal, intentional, malicious act—an act beyond mere negligence—breaks the causal connection *unless* the license dealer knew or had reason to know that the minor had a propensity to commit such an act." *Id.* at 119 (¶ 26) (citing *Robinson*, 372 So. 2d at 1076.  The *Williams* Court found that Walmart had no reason to know that the minor would commit a criminal act as there was no evidence that he had a criminal record "or that he had exhibited a propensity for violence . . . ." *Id.* at 120 (¶ 29).

¶62. "Generally, if a person of ordinary intelligence would not have 'anticipated the dangers that his negligent act created for others,' then the injury would not be considered foreseeable." *Sanderson Farms, Inc. v. McCullough*, 212 So. 3d 69, 76 (¶ 17) (Miss. 2017) (quoting *Ogburn v. City of Wiggins*, 919 So. 2d 85, 92 (Miss. Ct. App. 2005)). In *Robinson* and *Williams*, the alleged negligent act was selling ammunition *to a minor*. It was not simply selling ammunition. Accordingly, both the *Robinson* and the *Williams* Courts looked for more information that would indicate the defendants in each case could have foreseen the criminal use to which the ammunition would be put. Any such evidence of criminal tendency in either case would have bridged a gap between the alleged negligent act and the injuries in question.

¶63. On the other hand, in the instant case, the connection between the duty alleged to be owed, the alleged negligent acts, and the injury are more direct. The District conducted a background check that surveyed criminal records as well as the child abuse registry. Further, the District reviewed Sandoval's driving record and his past employment records. Although no previous complaints against Sandoval were of the same nature as the events giving rise to the instant litigation, the District received complaints that "pertained in some way or another to misbehavior or misconduct by students." The District had a system whereby each complaint was recorded and investigated, either by taking student statements or by reviewing the bus video tape. The District's own measures to screen and monitor its bus drivers arguably indicate that a person of ordinary intelligence could anticipate the failure to properly do so would lead to the type of injury sustained by the plaintiff here.

29

# CONCLUSION

¶64.    As to the application of discretionary-function immunity, we hold that discretionary-function immunity protects the District from the plaintiff's claims that it failed to adopt sufficient policies and procedures.  However, the plaintiff's remaining claims regarding negligent hiring, supervision, and training are claims sounding in simple negligence, and as to those claims, we reverse the trial court's grant of summary judgment.

¶65.    We also hold that the plaintiff has successfully demonstrated a triable issue of fact as to whether her alleged injuries were a reasonably foreseeable consequence of the alleged negligent acts and omissions on the part of the District.

¶66.    **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**KING, P.J., CHAMBERLIN, ISHEE, SULLIVAN AND BRANNING, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, P.J., CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ. GRIFFIS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. RANDOLPH, C.J., NOT PARTICIPATING.**

**MAXWELL, JUSTICE, SPECIALLY CONCURRING:**

¶67.    I agree with the result reached by the majority remanding the "pure negligence" claims against the District.  As the majority rightly distinguishes, there is a difference between a claim that the District did not implement or follow a policy versus a claim that the District negligently hired, trained, retained, and/or supervised Sandoval.  The former type claim is barred by discretionary-function immunity.  The latter is not.

¶68.    But I write separately to point out what continues to be a troubling trend in Mississippi Tort Claims Act cases in the post-***Brantley*** era.  ***Brantley v. City of Horn Lake***, 152 So. 3d

1106 (Miss. 2014), *overruled by* **Wilcher v. Lincoln Cnty. Bd. of Supervisors**, 243 So. 3d 177 (Miss. 2018). And that namely is plaintiffs' continued assertion of tort claims against public entities based on so-called breaches of "ministerial duties." As we explained in **Wilcher**, the Mississippi Tort Claims Act is about *immunity*. **Wilcher**, 243 So. 3d at 184. The MTCA "does not in itself create duties" that if violated create tort liability. **Id.** (citing **Taylor v. Delta Reg'l Med. Ctr.**, 186 So. 3d 384, 390-91 (Miss. Ct. App. 2016)). The same is true of regulations and policies—they do not confer a right to recovery. **Id.** So to say a statute, regulation, or policy created a "ministerial duty"—as opposed to a discretionary function—is merely a defense to immunity. Under Mississippi law, ministerial duties, in and of themselves, do not establish a cause of action for liability.

¶69. Here, to support the allegation that the school district was negligent in its hiring, training, supervising, and retaining Sandoval, J.S.'s attorney makes the constant refrain that the District had various "ministerial duties" it did not fulfill. In other words, what J.S.'s attorney has done is *presume* viable tort claims exist simply because he has alleged the District failed to follow certain "ministerial duties." Her attorney even goes so far as to suggest what amounts to strict liability—that the District had a mandatory duty to *ensure* her safety. But Mississippi law does not allow courts to "presume that the alleged violation of a regulation or ordinance, itself, established a viable cause of action without even questioning if a claim would exist *without* the regulation." **Id.** Instead, what our courts are tasked to do is look past the generic ministerial duty label and examine the real "activity in question"—i.e., "the allegedly tortious act giving rise to the claim." **Id.**

¶70. Here, the District did not move to dismiss the complaint for failure to state a negligence claim. Further, I agree with the majority that the District's summary-judgment motion focused on its assertion of discretionary-function immunity and the lack of evidence that J.S.'s injuries were reasonably foreseeable. So whether J.S. can in fact prove any pure negligence claims against the District is an issue for the trial court on remand and not this Court on appeal. But on remand, the controlling question should be whether the District failed to exercise ordinary care and whether it was reasonably foreseeable that the District's failure would lead to J.S.'s injuries. While the District's alleged failures to follow its own rules and regulations can certainly inform that question, that question cannot be resolved by simply asserting the District has the "ministerial duty" to ensure J.S.'s safety. Again, that is not a tort claim.

**COLEMAN, P.J., CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., JOIN THIS OPINION.**